**Dissenting Opinion Filed December 29 , 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-13-00421-CR
No. 05-13-00423-CR
No. 05-13-00424-CR
No. 05-13-00425-CR

**THE STATE OF TEXAS, Appellant**

**V.**

**ALBERT G. HILL, III, Appellee**

**On Appeal from the 204th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause Nos. F11-00180-Q, F11-00182-Q, F11-00183-Q, F11-00191-Q**

## DISSENTING OPINION

Dissenting Opinion by Justice Bridges

I respectfully dissent from the majority's opinion and judgment because I would conclude

the trial court did not abuse its discretion in conducting a hearing on Hill's motion to dismiss and

dismissing with prejudice the indictments against Hill.

No appellate court in Texas has ever ruled that a trial court erred in conducting a hearing

on a defendant's motion to dismiss charges on the basis they violated his constitutional rights.

*See, e.g.*, *State v. Dinur*, 383 S.W.3d 695, 698–99 (Tex. App.—Houston [14th Dist.] 2012, no

pet.) (trial court conducted hearing on appellant's motion to dismiss charges against him on the

basis of, among other things, selective prosecution); *Rodriguez v. State*, 283 S.W.3d 465, 471–72

(Tex. App.—San Antonio 2009, pet. dism'd) (trial court conducted hearing on appellant's claim,

similar to claim of selective prosecution, that trial court denied him equal protection, due process, equity, and fairness when it dismissed a virtually identical bond forfeiture case against another defendant and his surety but did not do the same for appellant); *Galvan v. State*, 988 S.W.2d 291, 293 (Tex. App.—Texarkana 1999, pet. ref'd) (trial court conducted hearing on appellant's motion to quash indictment on basis he was selectively prosecuted for bail jumping due to his race and nationality); *Amaya v. State*, No. 08-11-00265-CR, 2013 WL 5593110, at *7–9 (Tex. App.—El Paso Oct. 9, 2013, no pet.) (not designated for publication) (trial court conducted pretrial hearing on appellant's motion to dismiss alleging prosecutorial vindictiveness in that prosecutor offered appellant prison time on a mandatory probation case following a motion to suppress hearing at which appellant did not prevail); *Roman v. State*, No. 08-11-00057-CR, 2012 WL 5287933, at *4–5 (Tex. App.—El Paso Oct. 24, 2012, no pet.) (not designated for publication) (trial court conducted hearing on appellant's motion to quash "due to selective/vindictive prosecution" supported only by copy of information charging her with harassment, copy of citizen complaint form she filed against detective, and track and confirm receipt from United States Postal Service).

Under article 28.01 of the code of criminal procedure, a trial court may set any criminal case for a pretrial hearing at which it must determine "preliminary matters," including a claim of prosecutorial vindictiveness. *See Neal v. State*, 150 S.W.3d 169, 176 (Tex. Crim. App. 2004). The trial court's decision to conduct an evidentiary hearing and dismiss the indictments with prejudice is reviewed for an abuse of discretion. *See State v. Terrazas*, 970 S.W.2d 157, 159 (Tex. App.—El Paso 1998), *aff'd*, 4 S.W.3d 720 (Tex. Crim. App. 1999).

Hill's motion to quash and dismiss the indictments was based on the following facts: Hill and his father were involved in "a hotly-contested federal lawsuit involving multi-billion dollar trusts." In February 2010, the federal judge presiding over the case entered an order finding that

Hill's father had testified falsely and submitted evidence in bad faith. Four days later, Hill's father, through his lawyer, submitted to the Dallas County District Attorney's Office a letter accusing Hill and his wife of mortgage fraud. In the months that followed, a law partner donated a total of $48,500 in three contributions to the re-election campaign of Dallas District Attorney Craig Watkins. No member of this firm had previously donated to Watkins's campaign.

In May 2010, Lisa Blue saw a magazine article raising the question of whether the district attorney's office would "go after" Hill "for shenanigans related to the house in which they live." The article described the circumstances surrounding the same $500,000 loan that had been reported to the district attorney. After Blue learned the investigation of Hill's alleged criminal conduct had been leaked to the press, she had a meeting with Terri Moore, First Assistant District Attorney at the time. Blue recommended that Hill not be indicted. Watkins was not present at the meeting.

Also in May 2010, the federal trust litigation settled. Following the settlement, Blue and her colleagues had a conflict with Hill over payment of more than $50 million in attorneys' fees attributed to Blue's six-month representation of Hill. Because of the indictments, Hill felt he could not testify and invoked his Fifth Amendment rights in the federal proceeding.

On January 20, 2011, Blue and Watkins met for dinner. Also in January 2011, while Blue was with Steve Malouf, Watkins called Blue and said, "There could be an indictment[1] or are you still interested in the indictments or . . . ." On another occasion, the date of which Blue could not remember, Watkins called Blue and again "mentioned the Hills." Blue said, "Craig, remember, I don't represent the Hills, so I can't -- there's nothing that I could talk about." Another lawyer was with Blue when she received this second call.

---

[1] In 2014, the Dallas County District Attorney's website said 100,000 cases are processed per year.

Blue and Watkins exchanged numerous phone calls in March 2011. On March 3, 2011, Blue met with Watkins to take publicity photos in connection with a $100,000 donation Blue made in his honor to SMU law school in 2010. On March 9, 2011, Blue had a fundraiser for Watkins at her house and contributed $5000 to Watkins. On March 22, 2011, Blue was deposed in connection with her fee dispute with Hill. On March 30, 2011, Blue and Watkins again met for dinner. On March 31, 2011, the Hills were indicted on charges of mortgage fraud. The indictments were made public two weeks before the $50 million fee dispute trial.

On October 12, 2012, approximately eighteen months after the Hills were indicted, the Hills' defense counsel met with Assistant District Attorney Deborah Smith who described a "re-evaluation" of certain cases and said she had already decided to recommend dismissing certain charges against both Hill and his wife. Smith "expressed significant concerns about the cases against the Hills, made clear that she had no role in obtaining the indictments, [and] said that the interviews of witnesses she was conducting should have been conducted much earlier." Shortly after the meeting, the DA moved to dismiss all charges against Hill's wife "in the interest of justice." On October 22, 2012, in response to a follow-up email from Hill's counsel, Smith wrote that she had been reassigned to prosecute animal cruelty cases.

On February 14, 2013, the trial judge conducted a hearing on Hill's motion to dismiss. The trial judge stated she did not take her authority to dismiss a case filed by the prosecutor lightly and emphasized the limited nature of that authority. The trial judge, over the State's objection, called Blue as a witness. Blue took the stand and invoked her Fifth Amendment right on all questions.

Hill's attorney called Watkins to the stand. Counsel for the State objected on the basis of lawyer/client privilege. Specifically, counsel argued the State of Texas was represented by the district attorney, and the State therefore had a right to assert the privilege to prevent its lawyers

–4–

from disclosing "any other fact which came to their knowledge by virtue of their representation of the State." Counsel for the State argued conversations between Blue and Watkins were work product because they would "reveal [Watkins's] mental impression." The trial judge instructed the State to "bring Mr. Watkins down."

An assistant district attorney entered the courtroom and stated she had spoken to Watkins, Watkins was in the office, but Watkins was not going to make himself available. The trial judge asked if Watkins was informed that the questions were going to be limited to his discussions with Blue. The assistant district attorney stated she was not aware of that and further stated she knew "[Watkins] to be ill," and he was not "in a condition to be able to testify in this matter." Following further discussion as to the extent of Watkins's illness and the fact that Watkins was under subpoena to testify, the trial judge granted a continuance.

On March 7, 2013, the trial judge conducted a hearing at which Blue's counsel stated Blue's position that "she would assert her Fifth Amendment privilege today just as she had before." Hill called Watkins as a witness and, after a private consultation with counsel, Watkins took the stand and refused to answer any questions "because of [his] right as an attorney to have the privilege and to protect [his] work product." Following a discussion of whether any privilege had been waived by providing affidavits of the people who worked for Watkins, the trial judge ordered Watkins to answer the questions. Watkins refused, and the trial judge held him in contempt.

Hill was prepared to call witnesses to testify regarding the authenticity of the exhibits attached to his motion to dismiss and certain other documents. Although it is not clear which exhibits were at issue, counsel for the State agreed he was stipulating to the authenticity of the exhibits.

Terri Moore, a former Dallas assistant district attorney, testified Donna Strittmatter and Stephanie Martin, two other assistant district attorneys, came to Moore and asked for permission to use the resources of the office to investigate Hill. Moore inquired whether Hill's father had made the allegations against him, and Strittmatter and Martin told Moore "there was a lawsuit between the father and the son." Moore said, "I'm sure dad is trying to get some kind of strategic advantage over his son in the lawsuit, so be very, very skeptical of whatever he may have told you." Moore added, "Be careful, because [Hill's father] is just using the office . . . ."

Strittmatter testified she attended the pitch session at which Watkins was present. Watkins did not say anything about conversations with Blue regarding the Hills. Strittmatter testified Watkins's only involvement in preparing the case for the grand jury was that he was present at the pitch session. The pitch session was in January 2011, and the case was presented to the grand jury approximately two and a half months later.

Strittmatter testified Moore told her "to be suspicious of the complaint" she received from Hill's father. Strittmatter later learned the trust "offered the bargain over a nonprosecution affidavit in this case" so that Hill would drop his claim for the assets of the trust. In investigating the case, Strittmatter discovered the "title agency missed something on the abstract of the property." When asked if she was aware whether the Dallas County District Attorney's Office had "indicted a mortgage fraud case where the loan was fully collateralized, paid as expected, and repaid in full and there was no complaint from the bank, but it was indicted anyway," Strittmatter answered she "was not aware because [she had] not been the mortgage fraud prosecutor." When asked the same question again, Strittmatter answered, "I don't know, but that doesn't mean it hasn't happened." When the trial judge asked if there was a way to identify similar cases via computer, Strittmatter answered, "We have a computer, but it wouldn't say that much detail, Your Honor. It'd really be the – the prosecutors' individual memory."

Martin testified that, on February 22, 2010, Strittmatter called her into a meeting with Lynn and gave her a copy of a complaint alleging Hill had stolen from the trust "because eighty percent of the house was put into a mortgage." Martin denied having "concerns about a case in which the bank was not the one that complained about the alleged fraud." Martin testified Moore told her to be suspicious of Hill's father. Martin testified that, from the moment she got the complaint and reviewed the exhibits, she thought she had a good case and immediately started requesting original documents.

Martin invited Watkins to the pitch session because the case against Hill "would get some media attention, possibly national media attention." Martin testified that, if Watkins had told her "this is too much of a hot potato; let's just let it go," she would not have put the case before the grand jury.

On redirect examination, Hill's counsel showed Martin notes Martin identified as "two different days where I wrote notes about having talked to David Pickett." The first date was September 8, 2010, and noted the following:

> David Pickett calls all the time. Investigation is slowly going, and I told him that. Today he wanted a definite timeline. I told him I can't give you a timeline. I've got things to do on the case and haven't done them because I'm getting ready for trial. He said Trust is actual victim after I told him bank really isn't interested in prosecuting. Told him that in research I'd done, didn't see how I could prove his criminal case at this time. He said he sent -- gave all that stuff to me. I said I'd go back and look, but getting ready for trial. He then sends e-mail. I showed it to Chief D. Strittmatter, and then she said to show to First Assistant Terri Moore so she would have all info, if needed. Took to Terri Moore, and she said, okay, in a few weeks call him to discuss the matter.

Upon further questioning, Martin testified the bank's general counsel said "we wouldn't have filed a complaint because we -- the loan got repaid, but she would do whatever [Martin] wanted her to do as far as prosecuting the case because, by law, she has to." The trial judge, reading from Martin's notes, stated "and then it goes on to say, I've talked to David Pickett multiple times since then. He was okay with not indicting for the Trust as a victim because the

bank is actual -- who was defrauded under the fraud statutes and going forward with indictments." In response to questioning, Martin testified the part of her note the trial judge read was "probably" added after Hill filed his motion to dismiss for prosecutorial misconduct.

Thus, as the trial judge summarized the situation, the pitch session was held only because the case against Hill was a potentially high publicity case; Martin invited Watkins to the pitch session and would not have gone forward with the case against Hill without Watkins's approval; the only person who could know Watkins's motivations was Watkins and, maybe, Blue; and neither Watkins nor Blue were testifying. The trial judge gave Watkins another opportunity to come down and testify and took a brief recess. When the hearing recommenced, counsel for the State told the trial judge Watkins would not testify.

Following the presentation of evidence, the trial judge made an oral finding that, "because of the failure of Mr. Watkins to testify in this hearing, the Defendant has been denied his right to have a meaningful hearing on his Motion to Dismiss." The trial judge then dismissed the cases. This appeal followed.

In its first two points of error, the State argues the trial court abused its discretion by granting Hill an evidentiary hearing and dismissing the indictments against him because (1) Hill tendered no evidence to support his request and (2) the facts Hill alleged failed to establish a constitutional violation. Specifically, the State challenges the trial judge's decision to hold an evidentiary hearing on Hill's claims of prosecutorial misconduct in its first two issues. The State first complains about Hill's proffer of evidence in support of his motion. The State argues that Hill needed to present evidence to support his claims before he was entitled to an evidentiary hearing and, because Hill "simply made unsworn allegations" in his motion and "attached a stack of unauthenticated documents" as exhibits, he basically provided no evidence to support his central allegations. The State asserts that, under *United States v. Armstrong*, 517 U.S. 456

(1996), the judge had to presume Watkins acted in good faith until Hill presented clear evidence to the contrary, and the presentation of such evidence was a condition that must be met before receiving an evidentiary hearing. The State contends that, because Hill tendered no evidence (other than some trial transcripts and deposition testimony, both of which the State argues are not clear evidence sufficient to dispel the presumption the prosecutor acted with a proper motive), the trial judge erred in conducting the evidentiary hearing. In response, Hill states the facts cast doubt on the constitutionality of the prosecution and not only entitle him to an evidentiary hearing but also establish a prima facie showing of prosecutorial misconduct.

The trial court's decision to conduct an evidentiary hearing and dismiss the indictments with prejudice is reviewed for an abuse of discretion. *See Terrazas*, 970 S.W.2d at 159. The test for whether the trial court abused its discretion is whether the action was arbitrary or unreasonable. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010).

Selective prosecution and vindictive prosecution are not defenses on the merits to the criminal charge but independent assertions that the prosecutor has brought the charge for reasons the Constitution prohibits. *See Armstrong*, 517 U.S. at 463; *Ex Parte Quintana*, 346 S.W.3d 681, 685 (Tex. App.—El Paso 2009, pet. ref'd). Generally, prosecutors have broad discretion in enforcing criminal laws. *See Neal*, 150 S.W.3d at 173. But selective prosecution does limit a prosecutor's otherwise broad discretion in determining what crimes to prosecute and how. *Quintana*, 346 S.W.3d at 685; *see Roise v. State*, 7 S.W.3d 225, 242–43 (Tex. App.—Austin 1999, pet. ref'd).

A defendant who believes he is subjected to selective prosecution bears the burden of proving purposeful discrimination. *See Green v. State*, 934 S.W.2d 92, 103 (Tex. Crim. App.

1996). This burden falls on the defendant because the presumption is that a prosecution for a violation of a criminal law is taken upon in "good faith and in nondiscriminatory fashion" to bring violators to justice. *See Gawlick v. State*, 608 S.W.2d 671, 673 (Tex. Crim. App. 1980); *Garcia v. State*, 172 S.W.3d 270, 273 (Tex. App.—El Paso 2005, no pet.). To establish a prima facie case, the defendant must show that: (1) the government has singled him out for prosecution even though the government has not proceeded against others similarly situated based on the type of conduct for which he is charged; and (2) the government's discriminatory selection is invidious, which means that the selection is based on impermissible considerations such as race, religion, or the desire to prevent his exercise of constitutional rights or based on some arbitrary classification. *Quintana*, 346 S.W.3d at 685; *Garcia*, 172 S.W.3d at 273-74. The defendant must provide "exceptionally clear" evidence that the decision to prosecute was for an improper reason to establish a prima facie case of selective prosecution. *See Garcia*, 172 S.W.3d at 274. Once the defendant makes a clear showing of an Equal Protection violation, the burden shifts to the State to justify the discriminatory treatment. *See Johnson v. California*, 543 U.S. 499, 505 (2005); *Quintana*, 346 S.W.3d at 685. However, the Equal Protection clauses of the United States and Texas Constitutions only require a rational basis for the distinction unless it discriminates against a suspect class or impinges on a fundamental right. *See Flores v. State*, 904 S.W.2d 129, 130 (Tex. Crim. App. 1995).

A constitutional claim of prosecutorial vindictiveness may be established in either of two distinct ways: (1) proof of circumstances that pose a "realistic likelihood" of such misconduct sufficient to raise a "presumption of prosecutorial vindictiveness," which the State must rebut or face dismissal of the charges; or (2) proof of "actual vindictiveness" — that is, direct evidence that the prosecutor's charging decision is an unjustifiable penalty resulting solely from the defendant's exercise of a protected legal right. *Neal*, 150 S.W.3d at 173. Under the first prong,

–10–

if the State pursues increased charges or an enhanced sentence after a defendant is convicted, exercises his legal right to appeal, and obtains a new trial, the Supreme Court has found a presumption of prosecutorial vindictiveness. *Id.* (citing *Blackledge v. Perry*, 417 U.S. 21 (1974)). In the very few situations in which this presumption does apply, it can be overcome by objective evidence in the record justifying the prosecutor's action. *Id.* at 173–74.

Under the second prong, when the presumption does not apply, the defendant may still obtain relief if he can show actual vindictiveness. *Id.* at 174. To establish that claim, a defendant must prove, with objective evidence, that the prosecutor's charging decision was a "direct and unjustifiable penalty" that resulted "solely from the defendant's exercise of a protected legal right." *Id.* Under this prong, the defendant shoulders the burden of both production and persuasion, unaided by any legal presumption. *Id.* Once again, the trial judge decides the ultimate factual issue based upon the evidence and credibility determinations. *Id.* at 174-75. Under either prong, "[i]f the defendant is unable to prove actual vindictiveness or a realistic likelihood of vindictiveness, a trial court need not reach the issue of government justification." *Id.* at 175. That is, the State may stand mute unless and until the defendant carries his burden of proof under either prong. *Id.*

A trial judge's limited authority to dismiss an indictment stems in part from the fact that the decision of whether to prosecute is a core executive constitutional function. *Armstrong*, 517 U.S. at 464–65. And because this power is within the province of the State, the State enjoys considerable discretion in deciding whether or not to prosecute and what charge to file or bring to the grand jury. *Wayte v. United States*, 470 U.S. 598, 607 (1985); *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *see also Neal*, 150 S.W.3d at 173. As a result of that discretion, our consideration of Hill's claims begins with a "presumption of regularity." That means we

presume the State made its decision to prosecute Hill in good faith and in compliance with the Constitution. *Armstrong*, 517 U.S. at 465–66; *Neal*, 150 S.W.3d at 173.

Because courts are hesitant to interfere with the State's exercise of its discretion to prosecute, a defendant challenging the State's decision to prosecute him must make out a prima facie showing that he has been prosecuted in violation of his constitutional rights. *United States v. Webster*, 162 F.3d 308, 333–34 (5th Cir. 1999). To do this, he must "dispel the presumption of good faith" and constitutional compliance by presenting "'clear evidence to the contrary.'" *Id.* at 334 (quoting *Armstrong*, 517 U.S. at 465); *see also Armstrong*, 517 U.S. at 464 (because prosecutors are afforded a "background presumption," the necessary showing "to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims"); *Garcia*, 172 S.W.3d at 274 (appellant "claiming selective prosecution must come forth with 'exceptionally clear evidence' that the prosecution was initiated for an improper reason.").

Importantly, a defendant who claims his constitutional rights were violated by some form of prosecutorial misconduct "is not automatically entitled to an evidentiary hearing to make the required showing." *Webster*, 162 F.3d at 334. Rather, he must "present facts 'sufficient to create a reasonable doubt about the constitutionality of [his] prosecution' . . . ." *Id.* (quoting *United States v. Jennings*, 724 F.2d 436, 445–46 (5th Cir. 1986)); *see also United States v. Cervantes*, 132 F.3d 1106, 1111 n.4 (5th Cir. 1981) (explaining that defendant is entitled to an evidentiary hearing related to constitutionality of his prosecution "only if the existing record proves the likely merit of [his] specific allegations"). The "facts" required to cast doubt about the constitutionality of the prosecution and rebut the presumption the State acted in good faith such that a person is entitled to an evidentiary hearing (or even discovery) must be more than allegations. *See Jennings*, 724 F.2d at 445–46 (motion containing broad, generalized allegations did not offer facts to the court to warrant evidentiary hearing); *see also Wade v. United States*,

504 U.S. 181, 186 (1992) (stating that "generalized allegations of improper motive" are not enough to entitle a defendant to a remedy, discovery, or evidentiary hearing); *United States v. Sanchez*, 517 F.3d 651, 671 (2d Cir. 2008) ("Generalized allegations of improper motive do not disturb the presumption of regularity.").

A defendant also is not automatically entitled to discovery to obtain information about the prosecutorial motive; the requisite threshold to obtain discovery on such claims requires the person to produce "some evidence tending to show the existence of the essential elements" of the claimed violations. *Armstrong*, 517 U.S. at 468. The standard for obtaining discovery in aid of such claims is "rigorous" and complements the "rigorous standard" for proving constitutional violations in the decision to prosecute. *Id.*

I agree with the State's contention that a criminal defendant is not entitled to probe prosecutorial motive absent clear evidence establishing a prima facie case of a constitutional violation. *See In re United States*, 397 F.3d 274, 284 (5th Cir. 2005). I also agree that the governing legal principles outlined above contemplate an initial evidentiary tender by Hill to displace the presumption the prosecutor acted in good faith. *See Armstrong*, 517 U.S. at 465; *Webster*, 162 F.3d at 334. I disagree, however, with the State's first argument that Hill provided "no evidence" with his motion in support of his claims.

Hill alleged in his motion that the influence exercised upon Watkins by Hill's father, his father's lawyer, and Blue deprived him of due process. He explained that Watkins had "a financial stake in the prosecution of the Hills" because indicting them benefited Blue (who was involved in a dispute with the Hills over attorneys' fees) and counsel for his father (who also was a major campaign contributor) "which in turn benefited" Watkins. Hill claimed Blue's influence and involvement with the indictment process were demonstrated by Blue's admission that Watkins contacted her two times before the indictments were returned and the pattern of phone

calls and text messages exchanged between Blue and Watkins (and others in the DA's office) in the weeks before the indictments were returned.

In his motion, Hill argued that, to prevail on his vindictive prosecution claim, he was required to show that (1) "the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse'" and (2) "he would not have been prosecuted except for the animus." *United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999). Hill alleged that the decision to prosecute him was prompted by the anger of his father after receiving an adverse ruling in the trust litigation and the animus of Blue in the fee-dispute litigation. He also maintained that the

> timing, circumstances, and unusual if not unprecedented nature of the Hill indictments make abundantly clear that the real motivation of these indictments was to benefit [Watkins's] prolific campaign contributor [his father's lawyer's law partner], and to assist [Watkins's] friend and benefactor, [Blue] by impairing the Hills' ability to contest [Blue's] enormous fee claims.

He claimed such animus was demonstrated by the improprieties inherent in the indictments (such as his denial of any pre-indictment notice or opportunity to be heard by the Grand Jury), the "unprecedented nature" of the charges, and Hill's understanding that the DA's office did not conduct a thorough investigation before indicting him. Hill's third allegation was that the indictments should be dismissed because he was denied equal protection under the law when he was prosecuted under circumstances that do not normally lead to criminal prosecution and when he was denied the benefit of pre-indictment notice.

The State concedes Blue's deposition testimony that Watkins called her two times regarding the Hill indictments was evidence. Attached to Hill's motion to dismiss were exhibits including a complaint from Hill's father's attorney that the Hills committed mortgage fraud; excerpts from Watkins's campaign finance reports; emails between Blue, Hill, Malouf, and Charla Aldous; excerpts from Blue's deposition; and the indictments against the Hills. The

–14–

record reflects that the State did not object to the numerous exhibits attached to Hill's motion to dismiss. Instead, the State filed a response to the merits of Hill's assertions contained in Hill's motion, appeared at the hearing on Hill's motion, and ended up stipulating to the authenticity of the exhibits. Further, Blue took the Fifth and refused to testify concerning her conversations with Watkins, which creates an adverse inference against the State. An adverse inference may not be drawn from a defendant's proper invocation of a privilege because in a criminal case "the stakes are higher and the State's sole interest is to convict." *Baxter v. Palmigiano*, 425 U.S. 308, 318-19 (1976). However, the danger of unfair prejudice is not the same when it is the defense rather than the State that seeks to draw an inference from a witness's invocation of privilege. I would reject the State's argument, made for the first time on appeal, that the exhibits were "no evidence," s*ee* TEX. R. APP. P. 33.1(a), and overrule the State's first issue.

In its second issue, the State argues Hill failed to make a prima facie case of a constitutional violation. At the hearing on Hill's motion to dismiss, the State made this same argument. However, the State raised this issue after the hearing had begun and after the trial judge determined Hill had already established a prima facie case. A review of the record shows the first thing the trial judge did at the February 14 hearing was address the court's power to dismiss the indictments against Hill. No new evidence was presented at the February 14 hearing. In response to the State's argument that Hill "want[ed] information" and "that's just discovery under 39.14," the trial judge questioned how Hill could "just want information" when "[Hill had] already provided, in the opinion of this Court, sufficient information." Later in the hearing, the trial judge specifically stated that "civil lawyers in a couple weeks ahead of time [of the indictments] making huge contributions to the District Attorney, and you have admissions by Ms. Blue that she discussed the indictments with Mr. Watkins" established a prima facie case to support the motion to dismiss. Another time, the trial judge stated, "This is a hearing on a

–15–

motion to dismiss or a motion to quash," and Hill "presented sufficient evidence to the Court in the form of their motion to dismiss and the response . . . to the State's objections that I believe rise to the level of a prima facie showing."

Thus, the record shows the trial judge made a determination that Hill established a prima facie case before the hearing on February 14. The trial judge began the hearing by questioning the court's authority to dismiss the indictments against Hill, not by addressing the issue of whether Hill made a prima facie showing of a constitutional violation. The trial judge's references to a "hearing" to follow referred to a hearing on specific issues the trial judge identified, not the issue of a prima facie case. Notably, the February 14 hearing was continued due to Watkins's refusal to appear, necessitating further "hearings" on the dismissal issue.

The gist of the allegations presented in Hill's motion is that there was an untoward interest in indicting him. He specifically claimed he was deprived of his right to a disinterested prosecutor and that he had been vindictively and selectively prosecuted. As proof of the alleged constitutional violations, Hill emphasized in his motion the following: (1) Watkins's campaign records showing political contributions from a lawyer associated with his father in the months after the February 2010 complaint and five months before the indictments were returned and a donation by Blue less than a month before the indictments; (2) information showing that Blue hosted a fundraiser for Watkins in the month before the indictments; (3) the "unusual" nature of the charges against him; (4) the lack of notice to him that indictments were being considered; (5) the suspect timing of the indictments in that they were returned just before the fee-dispute trial involving Blue, which Hill claimed prevented him and his wife from testifying in that trial; (6) Blue's telephone records and text message logs, which Hill claimed show a "heated exchange" of communications with Watkins and his office in the weeks leading up to the indictments and ending after the indictments were returned; (7) Blue's admission during her depositions that she

discussed indictments with Watkins in the time before they were returned; (8) Blue's comment made in her deposition that she would have no reason to discuss indictments with Watkins after they were returned; (9) Blue's close relationship with Watkins; (10) defense counsel's meeting with Smith about the charges; and (11) the fact that the charges against Hill's wife were dismissed. In addition, the trial judge heard from the district attorney's office that they did not initially think this was a good case, and the trial judge noted Martin was impeached with her own notes.

I would conclude the trial judge did not abuse her discretion in determining these facts establish a prima facie case of a selective prosecution, vindictive prosecution, and absence of an impartial and disinterested prosecutor. *See Terrazas*, 970 S.W.2d at 159. The evidence presented by Hill amounted to "more than allegations." *See Jennings*, 724 F.2d at 445–46. By conducting a hearing after Hill made a prima facie case of a constitutional violation, the trial judge correctly shifted the inquiry to whether the State could produce evidence showing why the prosecution of Hill was not vindictive or selective or undertaken by an impartial and disinterested prosecutor. *See Neal*, 150 S.W.3d at 173. Following the State's failure to present evidence from Watkins or Blue to rebut Hill's prima facie case, the trial judge did not abuse her discretion in dismissing the indictments against Hill. *Id.* at 173–75. I would overrule the State's second issue.

In its third issue, the State argues the trial judge abused her discretion by compelling Watkins to testify and then dismissing the indictments based on his refusal to testify. Specifically, the State argues Hill was attempting to "invade protected work product" by seeking to discover the basis for Watkins's decision to seek indictments against Hill.

In its response to Hill's motion to dismiss, the State asserted Hill's argument assumed the district attorney was not free to discuss these crimes or his investigation with others or, more

particularly, Blue. The State argued Hill's assumption is false and argued that, even if the district attorney spoke to Blue about Hill's cases every single time the two communicated, there was nothing improper about it. As the county's prosecuting authority, the district attorney is obligated to investigate allegations of criminal activity and, according to the State, any source that could inform his decision about whether to prosecute and what to prosecute an individual for is fair game. The State argued it would be reasonable for the district attorney to conclude that Blue's prior relationship with Hill, which was both personal and professional, made her a potential source of reliable information.

Again, nowhere in its response did the State challenge the authenticity or veracity of any of the exhibits attached to Hill's motion to dismiss or argue that Hill's motion failed to make out a prima facie showing that he had been prosecuted in violation of his constitutional rights. Further, the record shows the State subsequently stipulated to the authenticity of the exhibits at a later hearing.

> Work product comprises:
>
> (1) material prepared or mental impressions developed in anticipation of litigation or for trial by or for a party or a party's representatives, including the party's attorneys, consultants, sureties, indemnitors, insurers, employees, or agents; or
>
> (2) a communication made in anticipation of litigation or for trial between a party and the party's representatives or among a party's representatives, including the party's attorneys, consultants, sureties, indemnitors, insurers, employees, or agents.

TEX. R. CIV. P. 192.5. The work product of an attorney or an attorney's representative that contains the attorney's or the attorney's representative's mental impressions, opinions, conclusions, or legal theories is not discoverable. *Id.* "The primary purpose of the work product rule is to shelter the mental processes, conclusions, and legal theories of the attorney, providing a privileged area within which the lawyer can analyze and prepare his or her case." *Owens Corning Fiberglas Corp. v. Caldwell*, 818 S.W.2d 749, 750 (Tex. 1991).

–18–

Our evidence rules provide, however, that a privilege can be waived:

> A person upon whom these rules confer a privilege against disclosure waives the privilege if:

> (1) the person or a predecessor of the person while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter unless such disclosure itself is privileged.

TEX. R. EVID. 511(1); *Jones v. State*, 181 S.W.3d 875, 878 (Tex. App.—Dallas 2006, pet. ref'd).

The State in this case did not raise any privilege or work product objections during the testimony of Moore, Strittmatter, or Martin. Through their collective testimony, the State allowed extensive evidence concerning the decision-making process before and during the events leading up to Hill's indictments. Thus, any claim of privilege related to that process was waived. *See* TEX. R. EVID. 511(1); *Jones*, 181 S.W.3d at 878.

Rule 1.05 of the Texas Rules of Disciplinary Procedure is pertinent to the issue of whether Watkins legitimately could solicit information from Blue concerning whether to indict Hill. Rule 1.05 provides:

> [A] lawyer shall not knowingly . . . (2) [u]se confidential information of a client to the disadvantage of the client unless the client consents after consultation [or] (3) [u]se confidential information of a former client to the disadvantage of the former client after the representation is concluded unless the former client consents after consultation or the confidential information has become generally known.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.05(b), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (West 2005) (TEX. STATE BAR R. art. X, § 9).

One of the primary purposes of the Sixth Amendment right to counsel is to preserve the integrity of the attorney-client relationship once it has been established. *State v. Frye*, 897 S.W.2d 324, 327 (Tex. Crim. App. 1995) (citing *Patterson v. Illinois*, 487 U.S. 285 (1988)). Both the court of criminal appeals and the United States Supreme Court have declared once an accused has a lawyer, "a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect." *Id.*

Here, Watkins's communication with Blue concerning Hill could have been a purely innocent inquiry into whether Blue, his personal friend, was simply "interested" in what was going on with Hill, in which case the inquiry would have had nothing to do with "a communication made in anticipation of litigation or for trial" and would not have constituted work product. The communication could have been an inquiry of Blue as a "potential source of reliable information" against Hill, in which case the communication would have violated rule 1.05. Or the communication could have been an inquiry into whether Blue, who had formerly urged the district attorney's office not to indict Hill while she represented Hill, was "still interested" in preventing the indictments now that she was seeking in excess of $50 million in attorney's fees from Hill. In that case, the characterization of Watkins's communication as "a communication made in anticipation of litigation or for trial" cannot stand; the purpose of the communication in that case would be to violate Hill's constitutional rights under the guise of legitimate "prosecution." None of these possibilities support the State's theory that Watkins's communication with Blue concerning the Hill indictments fit within the definition of work product. I would overrule the State's third issue.

In its fourth issue, the State argues the trial judge abused her discretion by dismissing the indictments with prejudice. The State argues dismissal without prejudice would have cured the claimed constitutional violations.

Dismissal with prejudice may be warranted when a defendant suffers demonstrable prejudice, or a substantial threat thereof, and where the trial court is unable to "identify and neutralize the taint" by other means. *Frye*, 897 S.W.2d at 330. Here, the evidence supported the trial judge's determination that Hill established a prima facie case his constitutional rights were violated, and the State presented no evidence enabling the trial judge to "identify and neutralize the taint." *See id.* It was for the trial judge to decide the ultimate factual issue based upon the

–20–

evidence and credibility determinations.  *Neal*, 150 S.W.3d at 174–75.  I would conclude the trial judge did not abuse her discretion in dismissing the indictments with prejudice.  I would overrule the State's fourth issue.

I would affirm the trial judge's order dismissing the indictments in these cases.

130421DF.P05

DAVID L. BRIDGES
JUSTICE
